**FILED**

AUG 1 7 2012

STEPHEN C. WILLIAMS
U.S. MAGISTRATE JUDGE
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

IN THE UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF ILLINOIS

IN THE MATTER OF THE SEARCH OF
THE CELLULAR TELEPHONE ASSIGNED
CALL NUMBER (786) 375-0695

Case No. 12 - m - 7057

**Filed Under Seal**

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, **Kevin Lauman**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (786) 375-0695, (the "**TARGET TELEPHONE**"), whose service provider is AT&T, a wireless telephone service provider headquartered at Glenridge Highlands Two, Atlanta, Georgia 31132.    The **TARGET TELEPHONE** is subscribed to TRACFONE (Pre-Paid), 12224 SW 114th Place, Miami, Florida 33176 and is being utilized by **Tenaucah LITTLE.** The **TARGET TELEPHONE** is further described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      I am a Special Agent currently assigned to the DEA Fairview Heights Resident Office.  I have been a Special Agent for approximately 3 years.  Prior to becoming a Special Agent, I was a police officer with the St. Louis Metropolitan Police Department for approximately 13 years, five of which I was assigned as a Task Force Officer with the DEA St. Louis Division.   I have participated in numerous narcotics investigations involving the manufacture, transportation, distribution, and sale of controlled substances, as well as the

methods of laundering the proceeds of these illegal activities. During the course of my law enforcement experience, I have participated in several complex investigations of drug-trafficking organizations dealing in cocaine, marijuana, heroin, methamphetamine and other controlled substances. I am familiar with and have used normal methods of investigation, including, but not limited to, visual surveillance, questioning of witnesses, search and arrest warrants, informants, pen registers, precision location information, confidential sources and undercover agents, and court-authorized wire interceptions. My specialized training has included, but is not limited to investigation of the manufacture, possession and distribution of controlled substance listed within the Controlled Substance Act, executing search and arrest warrants involving drug offenses, gathering drug and non-drug evidence, undercover assignments, supervision and utilization of informants, clandestine laboratories, smuggling, money laundering, monitoring drug related conversations in other cases via court authorized electronic eavesdropping. DEA Fairview Heights Resident Office is comprised of at least five special agents of the DEA, as well as officers of the Illinois State Police, St. Clair County Sheriff's Department, Fairmont City, Collinsville, Cahokia, and Fairview Heights Police Departments. These agents and task force officers have collectively accumulated information, experience and training in the areas of narcotics-based economic crime. The investigative team has had experience in interviewing defendants, witnesses, informants and others who are knowledgeable about gathering, spending, converting, transporting, distributing, concealing and laundering proceeds of narcotics trafficking. They also have experience in testifying in federal court as witnesses in drug related matters, and court authorized interception of wire/oral communication.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, Confidential Sources

2

(referred to as CS's), and Sources of Information (referred to as SOI's), and Title III interceptions. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Upon information and belief, the AT&T cellular brand telephone bearing cellular telephone number (786) 375-0695 (hereinafter the **TARGET TELEPHONE**) which is subscribed to TRACFONE (Pre-Paid), 12224 SW 114th Place, Miami, Florida 33176, is presently being used by **Tenaucah LITTLE** in connection with the commission of offenses involving ongoing violations of Title 21, United States Code, Sections 846 and 841(a)(1).

5.      Your affiant further states that there is probable cause to believe that signaling information, including cell site information, precision location information, and factory installed GPS information will lead to evidence of the aforementioned criminal offenses, as well as to the identification of individuals who are engaged in the commission of those criminal offense and related crimes.

6.      The source of your affiant's information and the grounds for his belief are based on court authorized wire intercepts of **LITTLE's** previous cellular telephone (786) 417-8806, the investigative teams personal observations, training and experience, information obtained from other agents, witnesses, Confidential Sources (referred to as CS's), and Sources of Information (referred to as SOI's).  For the reasons set out in this affidavit, there is probable cause to believe the above offenses have been committed, are being committed, and will continue to be committed by members of the **Tenaucah LITTLE Drug Trafficking Organization (DTO)**, and his close associates, including his cocaine source of supply **Allen REDMOND,** and others known and unknown to the **LITTLE DTO.**

7.      The investigation of the **Tenaucah LITTLE Drug Trafficking Organization**

3

**(DTO)** began in April 2011, when agents received information from the Centralia, Illinois Police Department that **LITTLE** has been and is currently distributing large amounts of cocaine in the area.

8.      In May 1998, **LITTLE** was arrested for "unlawful delivery of a controlled substance (powder cocaine) and charged by the Marion County States Prosecutors office with "Delivery of Controlled Substance – Cocaine." **LITTLE** pled guilty and was sentenced to 4 years of probation and 90 days of home confinement.

9.      Between 1999 and 2012, law enforcement made periodic attempts to infiltrate the **LITTLE DTO,** but they were unsuccessful.

10.     However, in May 2012, agents with the Drug Enforcement Administration, Fairview Heights Resident Office (FHRO), cultivated a confidential source, hereinafter referred to as CS#1, who has continued to assist law enforcement in infiltrating the **LITTLE DTO.** On May 30, 2012, prior to CS #1's cooperation with agents, CS #1 acquired approximately 1/2 kilogram quantity of cocaine on the "front" from **LITTLE.**

11.     On June 8, 2012 and June 30, 2012, while cooperating with agents, CS #1 made two separate controlled drug payment to one of **LITTLE's** "distributor/couriers" named **Walter GARDNER,** which was for cocaine CS #1 previously received from **LITTLE.**

12.     On June 25, 2012, based upon the above listed events, United States District Judge G. Patrick Murphy signed an Order in the Southern District of Illinois authorizing Title III interception of **LITTLE's** cellular telephone 786-417-8806. During the Title III intercept, agents learned that **LITTLE** was in communication with cellular telephone number (773) 592-7726 which is currently being utilized by **LITTLE's** cocaine source of supply **Allen**

4

REDMOND.  During several intercepted telephone conversations and text messages, **LITTLE** was attempting to obtain additional drugs from **REDMOND**

13.  On July 1, 2012, agents intercepted an outgoing text message from **LITTLE** to **REDMOND** in which **LITTLE** told **REDMOND** "Getn new number tomorrow."  Based upon the intercepted call, agents believe **LITTLE** is informing his cocaine source of supply that he will be obtaining a new cellular telephone number.

14.  From July 2, 2012 to July 3, 2012, **LITTLE** had three (3) outgoing intercepted text messages with **REDMOND.**  During the three text messages **LITTLE** asks **REMOND,** "any luck?" (Call #1), "any luck?" (Call #2) and "Sup any news?"  Agents believe **LITTLE** is inquiring if **REDMOND** has any cocaine available.

15.  Agents analyzed toll records for LITTLE's previous telephone 786-417-8806, and noticed around July 3, 2012, the number of incoming/outgoing telephone calls to/from 786-417-8806 began to decrease, which is consistent with an individual discontinuing the use of a particular telephone. Based on this, Agents believed that LITTLE discontinued using telephone number 786-417-8806.

16.  Through common call analysis, a precision location order, and surveillance, agents discovered that **LITTLE** replaced telephone 786-417-8806 with the **TARGET TELEPHONE**.  The **TARGET TELEPHONE'S** account was established on July 3, 2012 (which corroborates LITTLE's statement to REDMOND on July 1, 2012 described above in para. 13).

17.  On July 13, 2012, Agents were granted a precision location order for the **TARGET TELEPHONE**, signed by United States Magistrate Judge Donald Wilkerson of the Southern District of Illinois. Agents continued to monitor data from this order until its expiration

5

on August 15, 2012. While this precision location order was active, Agents used the data from this order to aid Agents with obtaining the order for the wire interception of the **TARGET TELEPHONE.**

18.    On July 30, 2012, United States District Court Judge G. Patrick Murphy signed an Order in the Southern District of Illinois authorizing Title III interception of the **TARGET TELEPHONE.** Agents will continue the Title III interception of the **TARGET TELEPHONE** until its expiration on August 29, 2012.

19.    On July 30, 2012, at approximately 6:33 p.m., **REDMOND** made an outgoing telephone call over 773-592-7726 to **LITTLE** on the **TARGET TELEPHONE.** The intercepted call between **REDMOND** and **LITTLE** is detailed below.

> **LITTLE:**  What's up?
> **REDMOND:**  Look..
> **LITTLE:**  What up?
> **REDMOND:**  I just got a call, I just got a call right.
> **LITTLE:**  Uh huh.
> **REDMOND:**  The Tasmanian devil called me.
> **LITTLE:**  Taz? From a long time ago?
> **REDMOND:**  Yeah, The Tasmanian devil just called me.
> **LITTLE:**  What did he say?
> **REDMOND:**  Thirty seven.
> **LITTLE:**  How much?
> **REDMOND:**  Thirty seven.
> **LITTLE:**  Thirty seven!!! And he uh, he got them?
> **REDMOND:**  He told me he got them, I told him I need four. I don't care what I need four.
> [Talking over each other]
>
> **REDMOND:**  You see the messed up part about it is that I'm giving him thirty seven for them, I don't know what the fuck to charge you.
> **LITTLE:**  God damn.  And he already got them or he got to get them.
> **REDMOND:**  He told me he just got the call and he is going to look at them right now.
> [Laughing]
> **LITTLE:**  Well dammit....

6

**REDMOND:** I am going to tell you what I am going to do. I am going to tell you what I am going to do. I told him I'll take four of them. Two of them I am going to break them down into all circles, and I need fifteen hundred a circle. I am not going to lie to you and tell you I'm going to do it any different.

**LITTLE:** Right.

**REDMOND:** Nine, nine, if you want nine…you got to give me eleven.

**LITTLE:** God damn

**REDMOND:** Other than that they can keep moving, it's that fucked up, up there.

**LITTLE:** Right

[Talking over each other]

**REDMOND:** He is the cheapest that is what I said, one mother fucker other another buddy was talking about forty. Man I cannot do forty.

[Talking over each other]

**LITTLE:** Well uh, like I said I tell you what. As soon as you, if he come through and you get it, call me when you have it in your hands, and I'll figure out what I am going to do from there. We will just play that way.

**REDMOND:** Like I said either one or two of them I'm breaking them all the way down, ain't gonna be no splits no nothing, it's going to be twenty eight a pop. I don't care how many you go, that is what you are going to get twenty eight a pop.

[Laughing]

**LITTLE:** Damn..

**REDMOND:** You laughing man I am serious as a mother fucker

**LITTLE:** Awe I believe you. I definitely believe you.

**REDMOND:** Cause when the friend called thought it was the three thing, naw Tasmanian Devil. I am like shit what is you waiting on? Because he had texted me and he said did you get my text? He texted me I'd seen the call I was on the other phone, I hung up the other phone and look I will talk to you later, shit.

**LITTLE:** (laughing) Right.

**REDMOND:** When I seen the number its Taz…Did you see my text? I don't care what your text said you got something for me come on with it, what is you waiting on.

**LITTLE:** Right.

**REDMOND:** I am no trying to have none of the other than that

**LITTLE:** Yeah well yeah shit, that is what I am telling yeah just play it by the hour, if it actually comes through then hit me up and I will figure out something from there.

**REDMOND:** He is the one who called, I've been calling him last week.

**LITTLE:** Right.

**REDMOND:** I got got tired and stopped calling and I text him the other day when I was at the race track, when they had the north versus the south. And I told him man whenever you ready. And I just left it at that.

**LITTLE:** Just let me know.

**REDMOND:** When he calls me, I am going to have to let you set your own price.

**LITTLE:** Right.

7

**REDMOND:** I don't know where you got to get to make something off of it, and then it was like he had not called, I would have messed up the nines. What the hell, I mean what would that do I don't want you coming all up this way for nine. But I did the other day.

**LITTLE:** But I tell you what god dammit, if you.

[Talking over each other]

**REDMOND:** I tell you this my buddy had some, and I bought a split, which is two and a quarter from him. I gave him twenty seven fifty, twenty seven fifty for that.

**LITTLE:** I tell you what god dammit if I have to come get them now and that is what u/i ¹you know what I mean at this point god dammit I got to do something. Do you know what I mean?

[Talking over each other]

**REDMOND:** That is why I gave you the first option. I called you and I called my buddy, the one I got twenty seven fifty the other day. You the first option, I am going to tell you like this. You better slow roll it as slow as you can and get as much as you can out of it.

**LITTLE:** Oh like I said I am going to tell you as soon as you get it in your hand, hit me from there and I will figure it out from there god dammit.

**REDMOND:** As soon as I have it in my hands, I am going to text you to see what you want to do.

**LITTLE:** Alright, I'll be sitting here waiting, I am about to leave the gym, I'll be sitting here waiting on it.

**REDMOND:** Alright.

**LITTLE:** Alright.

When **REDMOND** told **LITTLE,** "I just got a call, I just got a call right. The Tasmanian Devil called me." Agents believe **REDMOND** was referring to his cocaine source of supply as "The Tasmanian Devil." **LITTLE** asked **REDMOND,** "What did he say?" **REDMOND** responded, "thirty-seven." Agents believe **REDMOND** was telling **LITTLE** the purchase price of one kilogram of cocaine is $37,000.00. **REDMOND** told **LITTLE,** "He told me he got them, I told him I need four. I don't care what I need four." **REDMOND** was telling **LITTLE** that **REDMOND's** source of supply told **REDMOND** that that **REDMOND's** source of supply "got them," which agents take to mean that **REDMOND's** source of supply has an amount of cocaine to sell. **REDMOND** went on to tell **LITTLE** that **REDMOND** told his source of supply that

---

1-Unintelligable

8

REDMOND was going to order four kilograms of cocaine. REDMOND continued, "You see the messed up part about it is that I'm giving him thirty-seven for them, I don't know what the fuck to charge you." REDMOND was unsure how much he was going to charge LITTLE for each kilogram of cocaine.' REDMOND told LITTLE, ". . . I told him I'll take four of them. Two of them I am going to break down into all circles, and I need fifteen hundred a circle." REDMOND was telling LITTLE he was going to obtain four kilograms of cocaine and break down two of the kilograms into ounce quantities to distribute at $1,500.00 per ounce. Agents believe the nature of this conversation identifies REDMOND as one of LITTLE's drug sources of supply. Furthermore, the conversation revealed that REDMOND has a source of supply above him.

20.     On August 10, 2012, at approximately 8:37 p.m., while intercepting communications over the TARGET TELEPHONE, a text message was received from REDMOND's telephone 773-592-7726.

REDMOND: 27,750 is what it cost me.

Here REDMOND is telling LITTLE that REDMOND's source of supply charged him $27,750 for the cocaine. From this text message agents believe that LITTLE is acquiring twenty seven ounces of cocaine from REDMOND, for the price of $27,750.

21.     On August 11, 2012, at approximately 5:05 p.m., while intercepting communications over the TARGET TELEPHONE, a telephone call was placed to REDMOND's telephone 773-349-1744. The following is an excerpt from that conversation:

> REDMOND: She just left.
> LITTLE: Oh, okay I was just seeing if she ever picked up or not.
> REDMOND: Yeah, she just left.
> LITTLE: Okay.

9

During this conversation **REDMOND** tells **LITTLE** that "she" (**BAKER**) just left. **LITTLE** responds by asking **REDMOND** if "she" (**BAKER**) ever picked up or not. Based on these series of intercepted telephone calls, and toll records, GPS data on **BAKER's** vehicle, and surveillance, agents believe that **LITTLE** instructed **BAKER** to drive to Chicago, Illinois and pick up and transport cocaine to **LITTLE**, which **LITTLE** ordered from **REDMOND**. Then **LITTLE** could distribute this cocaine in the Southern District of Illinois.

22.     To date Agents are still intercepting the **TARGET TELEPHONE**, and pen records show that to date the **TARGET TELEPHONE** is still receiving and transmitting telephone calls (via text and wire communications), and also shows that **LITTLE** is still using the **TARGET TELEPHONE** in furtherance of drug trafficking.

23.     In my training and experience, I have learned that **AT&T** is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not

10

necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

24.     Based on my training and experience, I know that **AT&T** can collect E-911 Phase II data about the location of the **TARGET TELEPHONE**, including by initiating a signal to determine the location of the **TARGET TELEPHONE** on **AT&T** network or with such other reference points as may be reasonably available.

25.     Based on my training and experience, I know that **AT&T** can collect cell- site data about the **TARGET TELEPHONE.**

## AUTHORIZATION REQUEST

26.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A).

27.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **TARGET TELEPHONE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information,

11

there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

28.     I further request that the Court direct AT&T to disclose to the government any information described in Attachment B that is within the possession, custody, or control of AT&T. I also request that the Court direct AT&T to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of the **TARGET TELEPHONE** on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

29.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **TARGET   TELEPHONE** outside of daytime hours.

30.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

12

Respectfully submitted,

Kevin Lauman
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on August 17, 2012.

Stanley Williams
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF ILLINOIS

13

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call number (786) 375-0695, (the **"TARGET TELEPHONE"),** whose wireless service provider is AT&T, a company headquartered at Glenridge Highlands Two, Atlanta, Georgia 31132. The **TARGET TELEPHONE** is subscribed to TRACFONE (Pre-Paid), 12224 SW 114th Place, Miami, Florida 33176 and is being utilized by **Tenaucah LITTLE.**

2. Information about the location of the **TARGET TELEPHONE** that is within the possession, custody, or control of AT&T, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

2

## ATTACHMENT B

### Particular Things to be Seized

All information about the location of the **TARGET TELEPHONE** described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the **TARGET TELEPHONE**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of **AT&T**, **AT&T** is required to disclose the Location Information to the government. In addition, **AT&T** must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with **AT&T's** services, including by initiating a signal to determine the location of the **TARGET TELEPHONE** on **AT&T's** network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate **AT&T** for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).